

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 12, 2025

**BY ECF**

The Honorable Dale E. Ho
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    **Re:**     ***United States v. Mohamed Bahi*, 25 Cr. 358 (DEH)**

Dear Judge Ho:

    The Government respectfully submits this letter in connection with the sentencing of defendant Mohamed Bahi, which is currently scheduled for November 18, 2025, at 10:00 a.m. For the reasons explained below, the Court should impose a sentence of at least one year and one day of imprisonment and order the defendant to pay $32,000 in restitution.[1]

**I.**      **Background**

    **A. Offense Conduct**

        **1. The Defendant's Participation in the Straw Donor Fraud Scheme**

    From at least in or about December 2020 through at least in or about March 2023, the defendant participated in a scheme to defraud the New York City Campaign Finance Board ("CFB") by soliciting straw donations to Eric Adams's 2021 and 2025 campaigns for Mayor of New York City (the "2021 Campaign," the "2025 Campaign," and collectively, the "Campaigns"). (PSR ¶ 6).[2] In particular, at the defendant's direction, the owners of two different companies organized, facilitated, and paid their respective employees to make a total of tens of thousands of dollars of straw donations, resulting in a loss of $32,000 by the CFB in fraudulently obtained matching funds paid to the Campaigns. (PSR ¶¶ 11, 13-15). The defendant was aware that the contributions must be from their own funds and that each contributor was required to sign a contribution card that stated:

---

[1] The Government intends to submit a proposed consent order of restitution in advance of the sentencing proceeding.

[2] "PSR" and "Presentence Report" refer to the Presentence Investigation Report prepared by the United States Probation Office, filed on November 3, 2025.

> I understand that State law requires that a contribution be in my name and be from my own funds. I hereby affirm that I was not, nor, to my knowledge, was anyone else, reimbursed in any manner for this contribution; that this contribution is not being made as a loan; and that this contribution is being made from my personal funds or my personal account, which has no corporate or business affiliation.

(PSR ¶ 10).

In October 2020, the defendant encouraged the owner ("Owner-1") of a particular company ("Company-1") to engage in a straw donor fraud scheme. In particular, the defendant suggested that Owner-1 hold a fundraiser at which Company-1's employees would make contributions to the 2021 Campaign, for which the employees would be reimbursed by Company-1. (PSR ¶ 14). Owner-1 did as the defendant suggested. (PSR ¶ 14). A number of Company-1's employees made contributions to the 2021 Campaign that were reimbursed by Company-1. (PSR ¶ 14). The 2021 Campaign obtained matching funds from the CFB based on these fraudulent donations.

In advance of a fundraiser for the 2021 Campaign held in December 2020, the defendant suggested to the owner ("Owner-2") of a particular company ("Company-2") that Owner-2 should engage in the same type of straw donor fraud scheme and that Owner-2 reimburse donations by his employees to the 2021 Campaign. (PSR ¶ 13). Owner-2 did as the defendant suggested. (PSR ¶ 13). Four of Company-2's employees made $2,000 contributions to the 2021 Campaign that were either reimbursed by, or paid for in advance by, Company-2. (PSR ¶ 13). The defendant attended the fundraiser with Owner-2 and the four Company-2 straw donor-employees. (PSR ¶ 13). The 2021 Campaign obtained matching funds from the CFB based on these fraudulent donations.

In May 2022, the defendant was appointed to be a Senior Liaison in the Mayor's Community Affairs Unit. (PSR ¶¶ 6, 79). While holding this position with City Hall, the defendant continued his participation in the straw donor fraud scheme. In March 2023, the defendant again solicited fraudulent straw donations from Owner-1. (PSR ¶ 15). Company-1 held a fundraiser at which a number of Company-1's employees made contributions to the 2025 Campaign that were reimbursed by Company-1. (PSR ¶ 15). The 2025 Campaign obtained matching funds from the CFB based on these fraudulent donations. (PSR ¶ 15).

In total, the CFB suffered a loss of $32,000 as a result of the fraudulently obtained matching funds paid to the Campaigns as a result of the defendant's role in the straw donor scheme. (*See* PSR ¶¶ 11, 13-15).

## 2. The Defendant's Obstruction of Justice

After the defendant learned about the federal investigation of the straw donor fraud scheme, he took substantial steps to obstruct justice in order to conceal his and others' participation in the straw donor fraud scheme. (PSR ¶ 8).

On June 13, 2024, the Federal Bureau of Investigation ("FBI") executed a search warrant at the home of Owner-2 and served grand jury subpoenas upon the four Company-2 employees who made straw donations in connection with the December 2020 fundraiser referenced above. (PSR ¶ 16). That same morning, Owner-2 called the defendant and notified him that the FBI had executed a search warrant at his home. (PSR ¶ 17). In the afternoon on that same day, the defendant went to Company-2's offices where he met with Owner-2 and the four straw donor-employees. (PSR ¶ 17). First, the defendant asked Owner-2 and each of the four employees to describe their interactions with the FBI. (PSR ¶ 17). Second, the defendant took photographs of the grand jury subpoenas with which the four employees had been served. (PSR ¶ 17). Third, the defendant told Owner-2 that if he continued to lie to the FBI and falsely maintain that he did not fund straw donations, he would be "ok," and he encouraged the four employees to lie to the FBI by falsely denying that they had made straw donations. (PSR ¶¶ 17-18). The defendant explained to Owner-2 and the four employees that, in his view, the FBI would be unable to prove that the reimbursements had occurred because the employees had been reimbursed in cash. (PSR ¶ 18).

On July 24, 2024, the FBI arrived at the defendant's residence at approximately 6:00 a.m. to execute a search warrant. (PSR ¶ 20). The defendant and his spouse repeatedly refused to answer the door and the defendant repeatedly ignored the FBI's calls to his cellphone. (PSR ¶ 20). The FBI then called the defendant's spouse, who initially lied and said she was not home; she then came to the door and refused to open it. (PSR ¶ 20). During the brief window of time when the FBI was outside the defendant's home, he deleted the Signal application from his phone (and along with it, the messages in that application) with the specific intent to prevent the FBI from reviewing certain of those communications. (PSR ¶ 23). Eventually, the defendant opened the door for the FBI. (PSR ¶ 21). The FBI promptly seized the defendant's cellphone pursuant to the warrant. (PSR ¶ 21).

Later that same day, the FBI reached out to the defendant after it had determined that the Signal application was missing from his cellphone. (PSR ¶ 23). During that call, the defendant admitted that he had recently deleted the Signal application, but refused to say when he did so. (PSR ¶ 23). The defendant then provided an intentionally misleading explanation about when and why he had deleted the application—he implied that he deleted it in light of upcoming travel to Egypt, rather than the real reason: that he wished to prevent the FBI from reviewing certain of the communications. (PSR ¶ 23).

### B. Procedural History

On October 7, 2024, the defendant was charged by Complaint 24 Mag. 3535 with one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3), and one count of destruction of records, in violation of 18 U.S.C. § 1519. (Dkt. 1; PSR ¶ 24). On October 8, 2024, the defendant was arrested, presented before the Honorable Robert W. Lehrburger, United States Magistrate Judge for the Southern District of New York, and released on bail. (Dkt. 4; PSR ¶ 25).

On August 12, 2025, the defendant waived indictment and consented to the filing of Information 25 Cr. 358 (DEH), which charged him with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. (PSR ¶ 1; Dkt. 40). In that same proceeding, the defendant pled guilty to the Information pursuant to a plea agreement. (PSR ¶ 1).

### C.  Guidelines Range

In the plea agreement, the parties stipulated that the applicable Guidelines range is 0 to 6 months' imprisonment, which is consistent with the Probation Office's calculation.  (Plea Agreement at 3; PSR ¶ 90).  In addition, as noted in the plea agreement and in the Presentence Report, because the applicable guideline range is in Zone A of the sentencing table and the applicable Guideline does not expressly require imposition of a term of imprisonment, a sentence of imprisonment is not required.  *See* U.S.S.G. § 5C1.1(b).  (Plea Agreement at 3; PSR ¶ 90).  Furthermore, as also noted in the plea agreement and in the Presentence Report, because the defendant received an adjustment under § 4C1.1 and his applicable Guideline range is in Zone A, the Guidelines provide that a sentence other than imprisonment is generally appropriate.  *See* U.S.S.G. § 5C1.1 app. n.10(A).  (Plea Agreement at 3; PSR ¶ 91).  However, the plea agreement expressly permits the Government to "seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)."  (Plea Agreement at 3).  *See also* U.S.S.G. Ch. 1 Pt. A ("[C]ourts are permitted to impose sentences outside the applicable guideline range as 'variances,' both for reasons related to the operation of the applicable guideline provisions and in light of individual characteristics unrelated to guideline provisions.").

### D.  The Probation Office's Recommended Sentence

In the Presentence Report, the Probation Office recommends that the Court impose a sentence of two years of probation.  (PSR at 34).

### E.  The Defendant's Requested Sentence

In the defendant's submission, he requests that the Court impose a sentence of one year of probation.  (Dkt. 47 at 25).

## II.  Discussion

### A.  Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone.  Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid

unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant;
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

"[D]istrict courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." *United States v. Jones*, 531 F.3d 163, 174 (2d Cir. 2008); *see also Gall*, 552 U.S. at 50 (If a district court imposes a sentence outside of the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.").

## B. The Court Should Impose a Sentence of At Least One Year and One Day of Imprisonment

The defendant's serious criminal conduct spanned more than three years and included both fraud and multiple instances of obstruction of justice, much of which continued or occurred while the defendant was a City Hall official. There is a significant need in this case for a sentence of incarceration to be imposed in order to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate general deterrence. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A)-(B). When those factors are weighed together with other factors, including the sentences given in comparable cases and the mitigating factors presented by the defendant, both the Guidelines range of 0 to 6 months' imprisonment and the Probation Office's recommended probationary sentence are inadequate to satisfy the ends of sentencing—a sentence of at least one year and one day of imprisonment is appropriate in this case. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(C).

### 1. The Defendant's Fraud Conduct Supports a Sentence of Incarceration

In the course of sentencing another defendant for straw donor fraud in a related case, this Court explained that straw donor fraud "is a serious offense that merits a serious sentence" and that it is "not a victimless crime." *United States v. Arkan*, No. 25 Cr. 13 (DEH), Dkt. 29 at 28 (S.D.N.Y. Aug. 15, 2025); *see also United States v. Hou*, No. S1 12 Cr. 153 (RJS), Dkt. 202 at 37 (S.D.N.Y. Nov. 21, 2013) (Judge Sullivan explaining that what makes straw donor fraud "a serious crime is the fact that it compromises and undermines an institution of free elections that are essential to our system of government."). This Court further explained that "New York City imposes strict limits on campaign contributions by individual donors for candidates participating in our matching finance system to prevent the buying and selling of political influence" and "to

promote public trust, which is the foundation of our system of government," but that those limits "are meaningless if individuals of means can circumvent them by making . . . multiple contributions in the names of others." *Arkan*, Dkt. 29 at 28-29. "And when the public trusts that our campaign finance laws are intended to safeguard is betrayed, it breeds a cynicism that corrupts our civic life." *Id.* at 29; *see also United States v. Pan*, No. S1 12 Cr. 153 (RJS), Dkt. 204 at 31 (S.D.N.Y. Nov. 21, 2013) (Judge Sullivan explaining that "the damage done by this [straw donor fraud] crime in adding to . . . what could fairly be characterized as public cynicism over this process is incalculable," and "it's a very serious crime for that reason because it makes people shrug and say the system is corrupt.").

This Court previously observed that while the amounts of money at issue—$18,000 of loss to the CFB in *Arkan*, and $32,000 of loss to the CFB here—may not be "staggering," a focus on those amounts would "downplay the importance of the values at stake in these kinds of cases." *Arkan*, Dkt. 29 at 29. This Court's observation was consistent with Judge Sullivan's statement in sentencing a defendant for straw donor fraud, that although "the intended loss amount"—$8,400 for one of the defendants in that case—"would not have spelled a difference in the election," straw donor fraud is "about undermining an electoral process and undermining a system that is one of the core institutions of government." *Pan*, Dkt. 204 at 31.

For precisely the reasons identified by this Court and Judge Sullivan, the defendant's participation in the straw donor fraud scheme was serious. The defendant carefully planned and executed a scheme in which he suggested or encouraged both Owner-1 and Owner-2 to use their employees to act as straw donors to the Campaigns. The scheme worked. In light of the defendant's involvement in the straw donor fraud scheme—which he continued to perpetrate after he became a City Hall official—Owner-1 and Owner-2 organized and facilitated numerous straw donations in connection with three separate fundraisers by the Campaigns, resulting in a loss to the CFB of $32,000 in fraudulently obtained matching funds paid to the Campaigns. While the amount of money was modest in the context of the total amount raised and spent in the Campaigns, "the [amount of] money doesn't do it justice in terms of the damage done." *Hou*, Dkt. 202 at 37.

## 2. The Defendant's Obstruction Conduct Supports a Sentence of Incarceration

The defendant's attempts to obstruct the FBI's investigation of his criminal conduct— while he was a City Hall official—was at least as damaging and serious as his yearslong participation in the straw donor fraud scheme. As Judge Kaplan observed in sentencing a defendant who, like the defendant here, also was a public official for obstruction of justice, such "crimes str[ike] at the heart of the criminal justice system" and they are "very serious crimes that call for a serious sentence." *United States v. Ash*, No. 19 Cr. 780 (LAK), Dkt. 181 at 34 (S.D.N.Y. Apr. 20, 2022); *see also United States v. Murray*, No. 22 Cr. 76 (LGS), Dkt. 110 at 33 (S.D.N.Y. Dec. 21, 2023) (Judge Schofield describing witness tampering as "serious because it's a sort of assault on our justice system"). Indeed, the defendant's obstructive conduct alone, even setting aside his participation in the straw donor scheme, would justify a meaningful sentence of incarceration.

The defendant, while serving as a City Hall official and carrying the imprimatur of the Mayor's Office, traveled to Company-2's offices immediately after five witnesses in a federal investigation—Owner-2 and the four straw-donor employees—were approached by the FBI about the criminal conduct they had undertaken with the defendant's encouragement. He found out as much as he could about the nature and scope of the investigation, and then advised all five of those witnesses to lie to the FBI to cover up their crimes, and to hide his involvement in the straw donor scheme. Had those witnesses followed the defendant's advice, and committed the additional federal crime of making false statements to federal agents, justice may never have been achieved in this case.

A month later, while the defendant was still serving as a City Hall official, the FBI arrived at his home to execute a search warrant and seize his cellphone. Consistent with the actions he took a month earlier when encouraging five witnesses to lie to the FBI, the defendant delayed opening the door for the FBI long enough to delete the Signal application (and the messages contained therein) from his cellphone in order to prevent the FBI from reviewing those messages. Both this blatant destruction of evidence and the defendant's earlier witness tampering were egregious actions that actively sought to undermine the criminal justice system in order to prevent the FBI from learning the truth about his and his co-conspirators' conduct.

### 3. Relevant Comparator Cases Support a Sentence of Incarceration

The sentences imposed in *Hou* and in *United States v. Baldeo*, No. S1 13 Cr. 125 (PAC), are useful comparators and confirm that a sentence of at least one year and one day of imprisonment is appropriate in this case. *See* 18 U.S.C. § 3553(a)(6).

Jia Hou was the treasurer of John Liu's campaign for Mayor of New York City. Hou coordinated dozens of illegal straw donations that were intended to result in at least $28,000 in fraudulently obtained matching funds, withheld evidence from the grand jury, and lied to federal agents. Hou was convicted at trial of wire fraud, obstruction of justice, and making false statements to a federal agent. Hou's was sentenced to 10 months' imprisonment. While the defendant's guilty plea is a mitigating factor as compared to Hou proceeding to trial, there are several aggravating factors present here that were not present in *Hou*. First, the defendant was a public official—serving the Mayor at City Hall—for the commission of part of the fraud scheme and the entirety of the obstruction conduct, whereas Hou was merely a campaign employee. Second, the defendant's fraud conduct spanned over nearly three years and two mayoral campaigns, where Hou's conduct took place primarily in two months and related to only one mayoral campaign. Third, Hou's obstruction conduct—principally withholding documents responsive to a grand jury subpoena—was not nearly as egregious as the defendant's affirmative encouragement that five other witnesses lie to the FBI and his subsequent deletion of certain evidence on his cellphone (with the FBI at his door).[3]

---

[3] The sentence imposed on Hou's co-conspirator by Judge Sullivan in *Pan* is not as useful a comparator because Pan's conduct was limited in scope and did not include obstruction. Pan recruited straw donors and illegally funneled $16,000 in straw donations into Liu Campaign, which was intended to generate between $5,000 and $10,000 in fraudulently obtained matching funds for

Albert Baldeo was a candidate for New York City Council. Like the defendant, after Baldeo learned about the FBI's investigation of his participation in a straw donor fraud scheme, Baldeo obstructed the investigation by repeatedly instructing certain straw donors to provide false information to, or not cooperate with, the FBI agents who were investigating contributions to his campaign. Baldeo was convicted at trial of obstruction charges, but was found not guilty on fraud-related charges, and was sentenced to 18 months' imprisonment. While the defendant's guilty plea is a mitigating factor as compared to Baldeo proceeding to trial, there are also some aggravating factors present here that were not present in *Baldeo*. Indeed, Baldeo was not a public official at the time of the offense (he was a candidate); Baldeo's alleged fraudulent conduct was limited to a three-month period; and Baldeo's conduct related only to a single campaign.

While *Hou* and *Baldeo* are useful comparators, this Court should not view the sentence imposed in *Arkan*—one year of probation—as supporting a similar sentence for the defendant here. Indeed, there are at least three significant aggravating factors present for the defendant that were not extant with respect to Arkan. First, unlike Arkan, the defendant was a public official at the time of the offenses. In particular the defendant's March 2023 straw donor fraud conduct (related to the 2025 Campaign), his June 2024 witness tampering, and his July 2024 destruction of evidence all took place while he was a City Hall official. Arkan, by contrast, was a private citizen who owned a construction company. Second, the defendant engaged in serious obstructive conduct— both witness tampering and destruction of evidence—while there was no evidence that Arkan engaged in any such conduct. Third, Arkan (who is 76 years old) is significantly older than the defendant (who is 40 years old).

### 4. The Defendant's Mitigating Circumstances Do Not Justify a Probationary Sentence

To be certain, the Court should weigh the mitigating information presented by the defendant, and the Government has carefully considered that information and incorporated it into its sentencing recommendation. That information, however, should not be given the weight that the defendant would accord it—for example, even after accounting for the defendant's good acts, which are commendable, a meaningful sentence of incarceration is still appropriate. *See, e.g.*, *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)). Similarly, the defendant highlights the impact on his family that would result from his incarceration; this, too, is both common and entirely insufficient to justify the imposition of a non-incarceratory sentence in these circumstances. *See, e.g.*, *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration.").

---

the Liu Campaign. After a jury trial, Pan was convicted of wire fraud and wire fraud conspiracy, and was sentenced to 4 months' imprisonment.

## III.    Conclusion

For the reasons set forth above, the Court should impose a sentence of one year and one day of imprisonment.[4]

Respectfully submitted,

JAY CLAYTON
United States Attorney

by:  /s/ Robert B. Sobelman
     Robert B. Sobelman
     Assistant United States Attorney
     (212) 637-2616

Cc: Derek Adams, Esq. (by ECF)

---

[4] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).